**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **GREGORY WHITE,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **07 C 437** |
| | ) | |
| **THOMAS MONAHAN,**[1] **and individual,** | ) | **Judge John Z. Lee** |
| **and TIMOTHY BUDZ, an individual.** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Gregory White, who at all times relevant to the complaint was a civil detainee at

the Joliet Sexually Violent Persons Treatment and Detention Facility ("TDF"), has sued

former TDF officials Thomas Monahan and Timothy Budz pursuant to 42 U.S.C. § 1983

and alleges that the conditions under which he was kept at the TDF violated his due

process rights as guaranteed by the Fourteenth Amendment to the U.S. Constitution.

Defendants have moved for summary judgment. For the reasons provided herein, the

Court grants in part and denies in part the motion.

**Facts**

Unless otherwise noted, the following facts are undisputed. From March 2, 2001

to June 2006, White was a civilly detained resident in the Joliet TDF, except for two

periods (April 4, 2002 to February 27, 2003 and April 2005 to May 25, 2006) during

which time he was incarcerated in the Will County Jail as a result of convictions for

committing battery upon staff members at the TDF. (Defs.' LR 56.1(a)(3) Stmt. ¶¶ 9-12.)

---

[1] Although the complaint's caption misspelled defendant's name as "Monohan," the parties' summary
judgment briefs and submissions spell defendant's name as "Monahan," and thus throughout this opinion,
the Court uses the parties' agreed spelling.

From 2001 until September 2003, defendant Monahan was the Bureau Chief who oversaw the overall operation of the TDF. (*Id.* ¶ 4.) From September 2003 until September 2005, Monahan was not employed at the TDF. (*Id.* ¶ 5.) From September 2005 until June 2006, he was the Facility Director of the TDF. (*Id.* ¶ 6.) In June 2006, White, as well as the entire TDF program, were relocated to Rushville, Illinois. (*Id.* ¶ 12.)

From 2000 until August 31, 2005, defendant Budz was the Facility Director who was responsible for the operation of the TDF. (*Id.* ¶ 7.) After August 31, 2005, Budz no longer worked at the TDF. (*Id.*) The TDF's security and administration reports to the Facility Director, and the Facility Director reports to the Bureau Chief. (*See* Defs.' Ex. B, Monahan Dep. at 19-20.)

At the TDF, residents are given various status levels depending on their behavior in the facility. (Defs.' LR 56.1(a)(3) Stmt. ¶ 19.) For General Status, *i.e.*, the default status, residents were permitted to be out of their rooms and utilize other areas of the TDF (such as the yard, gym, day room, etc.) from approximately 7:00 a.m. to 10:45 p.m. with the exception of counts, during which time residents had to be in their respective rooms. (*Id.*)

When residents commit rule violations, their status is lowered to Close Management Status, Secure Management Status, or Temporary Secure Management Status. (*Id.* ¶ 20.) This determination is made by the TDF's Behavior Management Committee ("BMC"), which is composed of security and treatment staff.[2] (*Id.*)

A resident is placed on Close Management Status for reasons including, but not limited to, an inability or refusal to follow facility rules or when a need for high levels of

---

[2] Defendants Monahan and Budz were never members of the BMC. (*Id.* ¶ 20.)

structure, support, and supervision is indicated. (See Defs.' Ex. L, Resident Handbook at 10.) A detainee on Close Management Status is permitted to access only his room and the day room. (Defs.' LR 56.1(a)(3) Stmt. ¶ 21.) When the BMC determines a resident is dangerous, the resident is placed on Secure Management Status and kept in his or another room with one hour of shower and day room/recreation time per day. (*Id. But see* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 21.) Lastly, in some circumstances, security staff place a resident on Temporary Secure Management status pending a determination by the Behavior Committee, which results in the resident being placed in one of the two observation units each with a Plexiglas panel in the wall to permit observation of the resident. (Defs.' LR 56.1(a)(3) Stmt. ¶¶ 22-23.)

Plaintiff estimates that he spent the majority of his time on Secure Management Status, Temporary Secure Management Status or Close Management Status while at the TDF. (*Id.* ¶ 26.) According to Plaintiff, he spent roughly 50% on Temporary Secure Management/Secure Management Status, 30% on Close Management Status, and 20% on general status. (*Id.*) Plaintiff also states, and defendants dispute, that he was subject to a consecutive, eight-month period of Temporary Secure Management Status during which he was only allowed to take a shower or spend time in the day room on only five occasions. (*Id.*) Defendants respond that their records show that plaintiff had not been placed on Temporary Secure Management Status for any eight-month period. Defendants also contend that Plaintiff failed to file a grievance as to this issue and cannot specify when this allegedly occurred other than to say that it happened in "2003, 2005, somewhere in that zone." (*Id.*) Plaintiff counters that he, in fact, spent a consecutive, eight-month period on Temporary Secure Management status and that during that period,

TDF staff inaccurately stated on his chart that he had refused shower and day room when he had never done so. (*Id.* ¶ 31.) Plaintiff also counters that he did not provide a written grievance during that time period because: (1) he was not allowed to have any paper, pen or pencil in the cell and (2) when he asked the TDF staff, the BMC, the sergeants, the captains, and the lieutenants to be let out for a shower or yard or dayroom time, they responded that "they would look into it." (Defs.' Ex. H, White Dep. at 180; Defs.' LR 56.1(a)(3) Stmt. ¶ 29.) Plaintiff states that during the eight-month period, he complained verbally to Budz and Monahan about not being let out. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 40.)

In addition, Plaintiff asserts that the TDF was infested with insects. (Defs.' LR 56.1(a)(3) Stmt. ¶ 41; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 19.) Specifically, he states that the TDF was infested with cockroaches, bees, wasps, ants, mosquitoes, spiders, and gnats. (Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 19.) From 2001 to 2006, Plaintiff suffered insect bites that caused sores on his arms, legs, chest, stomach, and back. (*Id.* ¶ 20.) He sought and received medical attention for the insect bites on ten occasions. (*Id.*) Although Budz does not recall Plaintiff speaking to him about the insect infestation, Plaintiff asserts that he spoke to Budz about the infestation in 2004 and stated that he was "getting eaten alive" by bugs in his cell. (*Id.* ¶¶ 21-22.) Plaintiff also spoke to Monahan about the cockroach infestation. (*Id.* ¶ 23.) Budz and Monahan received complaints from other residents regarding the insect infestation at the TDF. (*Id.* ¶ 24.) Budz does not recall if he received or followed up on any complaints from the TDF residents regarding insects. (*Id.* ¶ 25.)

Plaintiff also claims that he was exposed to extreme temperatures at the TDF. (Defs.' LR 56.1(a)(3) Stmt. ¶ 55.) He states that the temperatures were freezing during the winters and unbearably hot in the summers. (*Id.*)

As to this issue, Plaintiff states, and Defendants dispute, that the temperatures each winter from 2001 to 2006 were so cold that it affected his ability to sleep. (Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 31.) Plaintiff states that (1) the windows in his cells did not close all the way which contributed to the extreme cold and (2) he only had a room with a properly opening and closing window for approximately fifteen days during the approximately five-year period that he resided at the TDF. (*Id.* ¶ 30.) Defendants note that, while in his cell, Plaintiff was allowed to have long underwear, blankets, sweatshirts and other clothing, and while in an observation room, he was allowed to have a jumpsuit, underwear, socks, t-shirts, two sheets and a blanket. (Defs.' LR 56.1(a)(3) Stmt. ¶ 59.) In December 2003, Plaintiff filed a grievance stating that his cell window could not close completely and it was so cold in his cell that he could see his own breath. (Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 31.) In February 2005, Plaintiff filed a grievance stating that that it was freezing in his cell and requesting a heated cell. (White Decl. Ex. M, 2/4/05 Grievance.) White also asserts that he verbally complained to Monahan in 2005 about the cold temperature in his cell. (Defs.' Ex. H, White Dep. at 47-49.)

The summers were not much better. Plaintiff states that the temperature in his cell felt like it reached 130 degrees in the summer months. (*Id.* ¶¶ 55-56.) Defendants state that the TDF maintenance staff took temperature readings on February 28, 2002, and August 3, 2003, that show that temperatures were within the acceptable range for living. (*Id.* ¶ 65.) Although Plaintiff concedes that the temperature readings in the TDF's

A and B living units on August 3, 2003 was between 85.8 and 86.3 degrees, Plaintiff states that the temperature readings taken on a select number of days were inaccurate because they were taken in front of blowing fans. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 63.) Additionally, although the engineer of the TDF opined that leaving the food pass door open on the resident room doors was adequate for allowing air circulation to cool resident rooms (Defs.' LR 56.1(a)(3) Stmt. ¶ 58), Plaintiff asserts that the TDF staff members denied his requests to have his food pass door, *i.e.*, the "chuck hole," opened for air circulation. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 58.) Plaintiff states that he spoke to Monahan about the hot temperatures in his cell in 2005. (Defs.' LR 56.1(a)(3) Stmt. ¶ 68.) Plaintiff also complained to Budz about the excessively hot temperatures in the TDF. (Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 32.)

<u>Discussion</u>

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views "the facts in a light most favorable to the nonmovant, and draw[s] all reasonable inferences in that party's favor." *Lane v. Williams*, 689 F.3d 879, 881 (7th Cir. 2012).

**I.      Statute of Limitations**

Defendants first argue that the summary judgment record establishes that Plaintiff's § 1983 claim is time-barred. In Illinois, the statute of limitations for a § 1983 claim is two years. *Gomez v. Randle*, 680 F.3d 859, 864 (7th Cir. 2012); 735 Ill. Comp. Stat. 5/13-202. The "continuing violation" doctrine governs the accrual of a claim and "permits a plaintiff in certain circumstances to reach back to the beginning of a claim

'even if that beginning lies outside of the statutory period, when it would be unreasonable to require or even permit him to sue separately over every incident of the defendant's unlawful conduct.'" *Macklin v. United States*, 300 F.3d 814, 824 (7th Cir. 2002) (quoting *Heard v. Sheahan*, 253 F.3d 316, 319 (7th Cir. 2001)); *see Heard*, 253 F.3d at 319 ("We have enough prisoners' suits without having to create incentives to bring multiple suits arising out of the same course of events.")

Plaintiff's due process claim is based on insect infestation, extreme hot and cold conditions, and permission to leave his cell only five times during an eight-month period. Plaintiff's application for leave to appeal in forma pauperis was granted on March 2, 2007, and thus the Court deems his complaint to have been filed on that date. *See* Local Rule 3.3(d). Accordingly, any claim based on events that occurred prior to March 2, 2005, is barred by the statute of limitations unless the continuing violation doctrine applies such that the claim does not accrue until after that date.

Because Plaintiff has created a triable issue of fact regarding whether his claims accrued after March 2, 2005, the Court holds that entry of summary judgment in Defendants' favor is inappropriate. As to his claim based on insect infestation and extreme hot or cold conditions, genuine disputes of material fact exist as to whether such deprivations occurred throughout his time at the TDF from 2001 to June 2006. (Defs.' LR 56.1(a)(3) Stmt. ¶¶ 3, 9-12; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 19-20 (infestation), 23-24 (same), 30 (infestation/extreme cold), 31 (extreme cold), 32-34 (extreme heat); 37 (infestation/extreme heat); *see* Defs.' Ex. H, White Dep. at 47, 69-70, 123 (stating he complained to Budz and Monahan about all of these issues in 2004-05).) As to his claim of being let out of his cell only five times during a consecutive eight-month period,

plaintiff states and defendant disputes that this deprivation occurred in "2003, 2005, somewhere in that zone." (Defs.' LR 56.1(a)(3) Stmt. ¶¶ 26, 29; *see* Defs.' Ex. H, White Dep. at 180; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 40.) Because a reasonable jury could conclude from the summary judgment record that White's claims accrued after March 2, 2005, the Court denies Defendants' summary judgment motion based on the statute of limitations.

## II.    Due Process Claim

Civilly committed detainees are protected by the Due Process Clause of the Fourteenth Amendment. *Sain v. Wood*, 512 F.3d 886, 893 (7th Cir. 2008). "Detainees are entitled to no less protection than prisoners whose treatment must meet the standards of the Eighth Amendment." *King v. Kramer*, 680 F.3d 1013, 1017 (7th Cir. 2012). The Court therefore refers to cases brought under either constitutional provision. *See id.* at 1018.

"Prison conditions may be harsh and uncomfortable without violating the Eighth Amendment's prohibition against cruel and unusual punishment." *Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997). However, "[t]he Eighth Amendment prohibits punishments that involve the unnecessary and wanton infliction of pain, are grossly disproportionate to the severity of the crime for which an inmate was imprisoned, or are totally without penological justification." *Caldwell v. Miller*, 790 F.2d 589, 600 (7th Cir. 1986); *see Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). "Because conditions of confinement are part of the penalty imposed upon criminal offenders, they too fall within the ambit of the Eighth Amendment." *Caldwell*, 790 F.2d at 600; *see Whitley v. Albers*, 475 U.S. 312, 319 (1986); *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

"[T]his protection means that the government may not, through deliberate indifference to a known risk of serious injury, deny White 'adequate food, clothing, shelter, and medical care.'"  *White v. Monahan*, 326 Fed. Appx. 385, 387 (7th Cir. 2009) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)).  For example, "[a] lack of heat, clothing, or sanitation can violate the Eighth Amendment."  *Gillis v. Litscher*, 468 F.3d 488, 494 (7th Cir. 2006).  The analysis is two-fold:  (1) "we must determine whether the conditions at issue were sufficiently serious so that a prison official's act or omission results in the denial of the minimal civilized measure of life's necessities"; and (2) "[i]f the inmate successfully establishes that the conditions were sufficiently serious, we then examine whether prison officials acted with deliberate indifference to the conditions in question."  *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008) (quotations omitted).  "Deliberate indifference . . . means that the official knew that the inmate faced a substantial risk of serious harm, and yet disregarded that risk by failing to take reasonable measures to address it."  *Id.* (quotation omitted).  "The minimum intent required is actual knowledge of impending harm easily preventable."  *Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992) (quotation omitted).

As an initial matter, Defendants argue that they should be afforded qualified immunity as to Plaintiff's due process claim.  "Qualified immunity shields a government official from liability for civil damages unless his or her conduct violates a clearly established principle or constitutional right of which a reasonable person would have known at the time."  *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012); *see Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "There is a two-part test for qualified immunity: (1) whether the facts, taken in the light most favorable to the plaintiff, show that the

defendants violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation. *Betker*, 692 F.3d at 860 (quotation omitted). However, "[w]hen the qualified immunity inquiry cannot be disentangled from disputed facts, the issue cannot be resolved without a trial." *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009).

Here, the undisputed facts show that the Court must grant summary judgment in favor of Monahan and Budz with regard to (1) any claim based on the time periods when White did not reside at the TDF and (2) any claim based on events that occurred when Monahan or Budz was not employed at the TDF. The factual record, taken in the light most favorable to the Plaintiff, show that Monahan and/or Budz could not have violated his constitutional right during those time periods. The parties agree that: (1) White was not a detainee at the TDF from April 4, 2002 to February 27, 2003 and April 2005 to May 25, 2006; (2) Monahan did not work at the TDF from September 2003 until September 2005; and (2) Budz no longer worked at the TDF after August 31, 2005. (Defs.' LR 56.1(a)(3) Stmt. ¶¶ 5, 7.)

However, with regard to the claims against Monahan during his employment at the TDF as Bureau Chief from 2001 to September 2003 and as Facility Director from September 1, 2005 to June 2006 and against Budz as Facility Director from 2000 to August 31, 2005 (excluding, of course, those months during which White was not a detainee at the TDF), the parties present conflicting versions of the material facts that underlie Plaintiff's due process claims as discussed below. Accordingly, it would be inappropriate for the Court to grant defendants' summary judgment motion based either

on qualified immunity or on the merits. The Court addresses each basis for Plaintiff's due process claim in turn.

### A. Claim That Plaintiff Was Let Out of Cell Only Five Times During Eight-month Period

"[W]here a plaintiff is provided with adequate food, clothing, and sanitation, the conditions of solitary confinement do not on their face violate the Eighth Amendment." *Del Raine v. Williford*, 32 F.3d 1024, 1033 (7th Cir. 1994) (quotation omitted). The Seventh Circuit has held that one shower a week for inmates of a segregation unit is constitutionally sufficient. *Davenport v. DeRobertis*, 844 F.2d 1310, 1316-17 (7th Cir. 1988). Further, "the principles that can be drawn from this circuit's case law manifest a clear aversion to denying prisoners outside exercise time for extended periods absent an acute need to do so." *Pearson v. Ramos*, 237 F.3d 881, 889 (7th Cir. 2001) (citing *Davenport*, 844 F.2d at 1315, and *Harris v. Fleming*, 839 F.2d 1232, 1236 (7th Cir. 1988)).

Plaintiff states that (1) he was placed on Secure Management Status for a consecutive eight-month period, and (2) he was only allowed to leave his cell five times during that period. (Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 14-16.) Defendants respond that Plaintiff was never placed in Secure Management Status for a consecutive eight-month period and that he repeatedly refused to take showers. (Defs.' LR 56.1(a)(3) Stmt. ¶¶ 29, 33.) Although Defendants state generally that Plaintiff was placed on Close Management Status during eight non-consecutive periods for various rule violations, including threatening of staff, Defendants do not provide any factual basis for each period of unit restriction or any acute security situation that required any deprivation that may have occurred. (*See id.* ¶¶ 32-34.) Plaintiff further argues that he never refused to take

showers, and any report that he refused to take a shower is false. (Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 14-16.)

The Court holds that when viewing the facts in the light most favorable to the nonmovant, a reasonable jury could conclude that Plaintiff suffered a sufficiently serious deprivation of the minimal civilized measure of life's necessities. It is for the trier of fact to determine whether the deprivation actually occurred, the duration of any such deprivation, and whether there was a particularly acute need for such a deprivation.

Further, the parties dispute whether Monahan and Budz were deliberately indifferent in this regard. Although Plaintiff states that he complained to Monahan and Budz about not being allowed out of his room when placed on Close or Secure Management Status (Defs.' Ex. H, White Dep. at 99-100) and that they failed to take any action to address it, neither Monahan nor Budz recall such a complaint (Defs.' Ex. D, Budz Dep. at 89; Defs.' Ex. H, White Dep. at 48-49). Given the disputed material facts, and because "credibility determinations are inappropriate on summary judgment", *see Walker v. Sheahan*, 526 F.3d 973, 980 (7th Cir. 2008), the Court denies Defendants' motion for summary judgment as to this claim.

### B.     Insect Infestation

"[A] prolonged pest infestation, specifically a significant infestation of cockroaches and mice, may be considered a deprivation sufficient to constitute a due process violation." *Sain*, 512 F.3d at 894.

> Depending on how extensive the infestation of a prisoner's cell is, what the infesting pests are, what odors or bites or risk of disease they create, what particular psychological sensitivities the prisoner was known to have . . . , and how long the infestation continues, a trier of fact might reasonably conclude that the prisoner had been subjected to

> harm sufficient to support a claim of cruel and unusual
> punishment even if he had not contracted a disease or
> suffered any physical pain.

*Thomas v. Illinois*, 697 F.3d 612, 614 (7th Cir. 2012). There are "three different types of harm that infestation of a prisoner's cell can create. One is disease. A second is psychological harm. And a third . . . is hazard, or probabilistic harm—'loss of a chance[.]'" *Id.* at 615.

"[C]ockroaches can transmit bacteria that aggravate asthma and cause other disease." *Id.* (citations omitted). "The potential psychological harm from living in a small cell infested with mice and cockroaches is pretty obvious." *Id.* Under the third type of harm, "heavy, protracted infestation of a prisoner's cell with such pests might be found to be a compensable hazard even if the prisoner plaintiff had been lucky and escaped disease and had had sufficient psychological fortitude (or ignorance) to avoid suffering mental distress whether from knowledge that he might become seriously ill as a consequence of the conditions in his cell or from sheer disgust." *Id.* at 615-16.

In *Sain v. Wood*, a case upon which Defendants rely, the summary judgment record showed that a detainee during his six-year confinement at the TDF, "often saw 'several' cockroaches crawling in his cell," "was bitten by a cockroach twice during his detention", and "an exterminator regularly visited his cell-every month or month and a half-and also would come in response to Mr. Sain's complaints." 512 F.3d 886, 894 (7th Cir. 2008). The *Sain* court stated that, although "[t]he conditions of Mr. Sain's detention were certainly unpleasant" and "[t]he state deserves no praise for permitting them to persist", "we cannot say that, whether considered individually or collectively, they constitute a constitutional violation." *Id.* The court concluded that "a reasonable jury

could not concluded that Mr. Sain's conditions of confinement were objectively serious enough to establish a constitutional violation." *Id.*

On the other hand, in *Antonelli v. Sheahan*, a Cook County Jail inmate alleged that defendants were deliberately indifferent to the prolonged pest infestation in his jail cell in that cockroaches were "everywhere," "crawling on his body (along with mice) and "constantly awaken[ing] him, and "causing the environment to be unsanitary," and alleged that his cell had been sprayed twice by a pest control service in sixteen months. 81 F.3d 1422, 1431 (7th Cir. 1996). Because the plaintiff had alleged that the infestation existed during a prolonged period of time and the above conditions alleged significant physical harm, the *Antonelli* court held that these allegations, if proven, would violate the Due Process Clause or the Eighth Amendment. *Id.* The *Antonelli* court therefore reversed the district court's granting defendant's motion to dismiss as to this claim. *Id.*

Similar to *Antonelli*, and in contrast to *Sain*, here, Plaintiff has presented sufficient facts such that a reasonable jury could conclude that the pest infestation was objectively serious enough to establish a constitutional violation. Plaintiff states that the TDF and his cells were infested with cockroaches, ants, wasps, bees, spiders, gnats, and mosquitoes from 2001 through 2005 and that he complained about the infestation throughout this period. (Defs.' Ex. H, White Dep. at 55, 69-70; *see* White Decl., Ex. I, 8/15/03 Grievance (cockroaches, bees, spiders, ants).) He states that mostly he saw insects in his cell and that he would wake up with red welts from insect bites that puffed up or turned into sores. (*Id.* at 55-56.) Plaintiff estimates that, from 2001 to 2006, there were cumulatively only nine weeks (including winters) that he was not bitten by an insect. (*Id.* at 159.) He estimates that he saw a doctor to treat infections due to his insect

bites over ten times but does not know the specific dates or times. (*Id.* at 58.) Plaintiff states that the bites were treated with Bacitracin and bandages. (*Id.* at 57, 60.) He states that during a period of time when he was being held in an observation cell on "temp special" status, he showed Monahan through the Plexiglas panel that Plaintiff's food trays were stacked as high as his waist due to the TDF staff members' refusal to remove them and that they were covered in maggots and roaches. (*Id.* at 74, 78.) Monahan stated that he would take care of it, but the trays and insects remained for two weeks to a month and smelled so bad that the staff and residents would not even come within five to ten feet of his cell. (*Id.* at 47-48, 78-79.) Plaintiff also complained to Budz about the insect infestation. (*Id.* at 61, 69-70, 77.) Plaintiff states that he asked TDF staff members on five occasions to send exterminators to spray his observation cell, but the staff members were not allowed to open the observation cell door to enable an exterminator to enter. (*Id.* at 67.)

Given the state of the record and again, viewing all disputed facts in Plaintiff's favor, the Court holds that there are triable issues regarding both the seriousness of the insect infestation in Plaintiff's cells and the state of mind of Budz and Monahan. Summary judgment as to this ground is also denied.

### C.     Extreme Cold and Extreme Heat/Lack of Ventilation

Inmates have "a right to be free from extreme hot and cold temperatures." *Shelby County Jail Inmates v. Westlake*, 798 F.2d 1085, 1087 (7th Cir. 1986). Inmates also have a right to adequate ventilation. *Id.* "To determine whether extreme heat or cold amount to a serious constitutional deprivation, courts look to various factors, including the severity of the cold or heat, its duration, whether the prisoner has alternative means to

protect himself, and whether the prisoner must endure other uncomfortable or harsh conditions." *Moore v. Monahan*, No. 06 C 6088, 2009 WL 310963, at *6 (N.D. Ill. Feb. 9, 2009). As the Seventh Circuit has observed, "[m]any things-beating with a rubber truncheon, water torture, electric shock, incessant noise, reruns of "Space 1999"-may cause agony as they occur yet leave no enduring injury. The state is not free to inflict such pains without cause just so long as it is careful to leave no marks." *Powers v. Snyder*, 484 F.3d 929, 932 (7th Cir. 2007) (quotation omitted). The Court addresses Plaintiff's assertion that he had been exposed to extreme cold and extreme heat in turn.

In cases dealing with cold conditions, the plaintiff must establish both that he was exposed to cold and he lacked alternative means to keep warm. *See Dixon v. Godinez*, 114 F.3d 640, 643 (7th Cir. 1997) (citing *Antonelli v. Sheahan*, 81 F.3d 1422, 1433 (7th Cir.1996) (no blankets); *Murphy v. Walker*, 51 F.3d 714, 720-21 (7th Cir.1995) (no clothes, bed, or bedclothing in mid-November); *Del Raine*, 32 F.3d at 1031 (no clothing, broken window, and forty-degrees-below-zero wind chill); *Henderson v. DeRobertis*, 940 F.2d 1055 (7th Cir. 1991) (malfunctioning heating system, broken window, subzero air temperature)); *see Wilson v. Seiter*, 501 U.S. 294, 304 (1991) ("Some conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise-for example, a low cell temperature at night combined with a failure to issue blankets."). "The question, however, is not simply whether the inmate had some alternative means of warmth, but whether the alternative was adequate to combat the cold." *Dixon*, 114 F.3d at 643. "Moreover, it is not just the severity of the cold, but the duration of the condition,

which determines whether the conditions of confinement are unconstitutional." *Id.* (citing *Del Raine*, 32 F.3d at 1031 (extreme exposure to brutal cold during a strip search), and *Henderson*, 940 F.2d at 1060 (failure to issue extra blankets, winter coats, or additional shirts during four-day period when temperature plummeted below zero and prison heating system malfunctioned)). "A condition which might not ordinarily violate the Eighth Amendment may nonetheless do so if it persists over an extended period of time." *Id.* "[T]he minimal standards required by the Eighth Amendment include the right of a prisoner 'not to be confined in a cell at so low a temperature as to cause severe discomfort[.]" *Id.* at 644 (quoting *Del Raine*, 32 F.3d at 1035).) Therefore, "courts should examine several factors in assessing claims based on low cell temperature, such as the severity of the cold; its duration; whether the prisoner has alternative means to protect himself from the cold; the adequacy of such alternatives; as well as whether he must endure other uncomfortable conditions as well as cold." *Id.*

Plaintiff spent six months to a year in a general status room (Cell 101A), including winter months, that had a damaged window that remained permanently half way open. (Defs.' Ex. H, White Dep. at 111-12.) Plaintiff spent three to six months, including winter months, in another regular room (Cell 118B, 119B, or 120B) that had a window that remained a quarter of the way open. (*Id.* at 112-13.) Plaintiff attempted to plug the space in these windows with towels or clothing. (*Id.* at 112-13.) The record shows that during the winter of 2003, Plaintiff wore three pairs of socks, three pairs of sweatpants, two t-shirts, one sweatshirt, one jacket, and one Bulls coat in a regular room. (Pl.'s Decl. Ex. J, 12/5/03 Grievance.) The record also shows that at one point, Plaintiff had two blankets while in a regular room. (Defs.' Ex. H, White Dep. at 126.) During the

winter months from 2001 to 2005, when White asked the TDF staff for a jacket, coat, long underwear, long sleeve shirt and extra blankets, he never received anything in response to his requests. (*Id.* at 127-28.)

In addition, Plaintiff spent periods of time in the A and B observation rooms during the winter. (*Id.* at 113-14.) The window in the A observation room was open all the way and the window in the B observation room was open half way, and Plaintiff had nothing to cover the gaps in the windows. (*Id.*) Plaintiff states that during the winter months while in an observation room, he wore a jumpsuit, three pairs of underwear, three t-shirts, and three pairs of socks and had a blanket and two sheets. (Defs.' Ex. H, White Dep. at 125.)

To counter these statements, Defendants provide a temperature log from a single day, *i.e.*, February 28, 2001, that shows that when the outside temperature was 21.1 degrees, the temperature in Rooms A403, A206, B416, and B121 ranged between 71.3 and 74.6 degrees. (Defs.' LR 56.1(a)(3) Stmt. ¶ 63.) On the other hand, Plaintiff questions the reliability of their measurements. Plaintiff states that the radiator heat to his rooms was unreliable and broke down with great regularity. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 59; Pl.'s Ex. 1, Bloyer Decl. ¶ 7.) Plaintiff states that he was unable to sleep for a total of three weeks due to the cold temperatures in the regular and observation cells. (*See* Defs.' Ex. H, White Dep. at 169 ("The temperatures was so cold I . . . was freezing, I was shaking almost the whole night. I could not sleep because of that.").) Plaintiff complained to TDF staff to have the windows repaired to no avail. (*Id.* at 113-16.) While in a regular cell, Plaintiff claims that he often could not sleep due to the cold, sometimes up to three days. (*Id.* at 185.)

Among the material facts in dispute are: (1) whether the temperatures in Plaintiff's cells were so cold that he could see his breath; (2) whether he felt he was freezing; (3) whether he was unable to sleep for three nights; (4) whether the temperature log from a single day on February 28, 2001, was indicative of the internal temperatures throughout the period from 2001 to 2006; (5) whether cold conditions of which Plaintiff complains persisted each winter from 2001 to 2006; (6) whether Plaintiff was actually provided any long underwear, long-sleeve shirts, sweatshirt, and a jacket when in a regular cell during the winter months other than 2003; and (7) whether a jumpsuit, three pairs of underwear, three t-shirts, three pairs of socks, a blanket and two sheets were adequate to protect Plaintiff from severe cold during winter months while in an observation room. In short, the Court holds that there are material issues of fact regarding the severity of the cold, its duration, whether the clothing and bedding provided Plaintiff with alternative means of protection from the cold, and the adequacy of such alternatives.

Additionally, whether Defendants acted with the requisite intent is hotly contested. Plaintiff states that he complained to them about the coldness and the malfunctioning windows. (Defs.' Ex. H, White Dep. at 47, 69-70, 123, 164-65; *see* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 2-3, 5-11, 31; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 60-61.) Budz claims that he reviewed temperature logs and decided that the temperatures were within the acceptable range for living and not much different than the general community. (*Id.* ¶ 65.) In December 2003, White filed a grievance stating that the cell window would not close, the temperature in his cell was so cold that he could see his own breath, and the cold was intolerable despite his wearing several layers of clothes. (Pl.'s LR 56.1(b)(3)(C)

Stmt. ¶ 31; Defs.' Ex. H, White Dep. at 123-24; Pl.'s Ex. 23, White Decl. ¶ 13; *id.*, Ex. J, 12/5/03 Grievance.)   Given the state of the record, the Court denies Defendants' summary judgment motion regarding Plaintiff's due process claim based on the extreme cold because a reasonable jury could find that an objectively serious deprivation occurred.

Plaintiff also bases his due process claim on the extreme hot temperatures at the TDF.   Plaintiff presents evidence, and Defendants provide contrary evidence, that the combination of poor ventilation and extreme hot temperatures constituted a constitutional violation.   Although it is undisputed that the resident rooms are not air conditioned, Defendants state that during the summer months, the A and B units at the TDF had air conditioning in the day rooms, large barn fans were placed in the halls outside resident rooms, and residents were permitted to obtain ice, have fans in their rooms, open their windows, and open chuck holes in their doors to increase air flow.   (Defs.' LR 56.1(a)(3) Stmt. ¶ 58.)   Plaintiff counters that the air conditioning broke down regularly, the electricity would shut off two to three times per day, he had no fan and his requests for one were denied, and the TDF staff would constantly turn the power off in his observation room during the day and night for periods up to 48 hours, deny his requests to open his chuck hole in both observation rooms and regular rooms, and refuse to give him ice.   (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 58; Defs.' Ex. H, White Dep. at 93-97; Pl.'s Ex. 1, Bloyer Decl. ¶ 7.)

Plaintiff also states that the extreme heat and lack of ventilation caused him to sweat through his clothes and bed sheets, made him feel constantly exhausted and tired, and caused him to feel like he was going to pass out.   (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 57.)

Defendants provide a single temperature log from August 3, 2003 (at an unspecified time of day) that shows that the temperature in Unit A's day room was 85.4 degrees and Unit B's day room was 84.8 degrees. (Defs.' Ex. N, TDF Temperature Logs.) Viewing the facts in the record in the light most favorable to Plaintiff, a reasonable jury could find that (1) the temperatures in Plaintiff's rooms were much hotter than the day rooms, which were equipped with air conditioning and fans; (2) any fan to alleviate extreme heat would not work without electricity which Plaintiff claims was often shut off in both his observation and regular rooms; (3) any relief provided by fans in any hallway would not provide air circulation in Plaintiff's rooms if the chuck hole door remained closed; (4) Plaintiff was often denied ice as a way of coping with the extreme heat; and (5) the extreme heat persisted each summer from 2001 to 2006. Accordingly, the Court holds that Plaintiff has raised a triable issue of fact regarding whether the extreme heat and lack of ventilation constituted an objectively serious deprivation.

Lastly, it is disputed whether Defendants were deliberately indifferent with regard to any deprivation based on extreme heat and lack of ventilation. Plaintiff states that he complained directly to Monahan and Budz about the extreme heat, inadequate ventilation and lack of alternative ways to cope with these issues. He also claims that Defendants said that they would look into it, and no changes were made to relieve the extreme heat and lack of ventilation. (Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 36-40; Defs.' Ex. H, White Dep. 102, 104-06.) Defendants contest these statements. (*Id.*) Accordingly, this issue also requires a trial.

## Conclusion

For the reasons provided herein, the Court grants in part and denies in part Defendants' summary judgment motion [doc. no. 198]. The motion is granted as to any claim based on any purported deprivation that occurred when: (1) Plaintiff was not a detainee at the TDF from April 4, 2002 to February 27, 2003 and April 2005 to May 25, 2006; (2) Monahan did not work at the TDF from September 2003 until September 2005; and (2) Budz no longer worked at the TDF after August 31, 2005. In all other respects, the Court denies the motion. Defendants' motion to strike [217] is stricken as moot because the Court, as a matter of course, determines whether statements of fact are supported by admissible evidence that is appropriately before the Court. The parties shall be prepared to schedule a settlement conference, final pretrial conference, final pretrial order due date, and trial date at the status hearing set for February 26, 2013 at 9:15 a.m.

**SO ORDERED**  **ENTER:  2/14/13**

_____
**JOHN Z. LEE**
**U.S. District Judge**